UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

GLOBAL OIL TOOLS, INC.                          CIVIL ACTION

VERSUS                                          NO.:

WILFRED J. BARNHILL, BRIAN                      SECTION:
A. BARNHILL, DIANE BARNHILL,
DENISE LEBLANC, DANIEL TRICHE,
DOWNHOLE-SURFACE MANUFACTURING
L.L.C., AND BARNHILL INDUSTRIES, INC.

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

NOW INTO COURT, through undersigned counsel, comes plaintiff Global

Oil Tools, Inc. to allege as follows and to seek the relief set forth herein.

## INTRODUCTION

This Complaint seeks relief under the Racketeer Influenced and Corrupt

Organizations Act (18 U.S.C. § 1962 "RICO"), the Lanham Act (15 U.S.C. § 1125),

and under Louisiana law.  In 2005, a third party purchased plaintiff Global Oil

Tools, Inc. ("Global") from Wilfred Barnhill, who remained on as president.  In

2007, Lyamec Corporation, Inc. acquired ownership of Global.  Wilfred Barnhill

remained Global's president until 2011.  Wilfred Barnhill's wife, Diane Barnhill,

and son, Brian Barnhill, were also employed by Global.  Brian Barnhill was

Global's Vice President, Financial Officer, and Treasurer.

During the times pertinent to this Complaint, the Barnhills were

responsible for Global's operations, marketing, purchasing, finances, inventory,

1

production, deliveries, receipts, accounting procedures, initiation of payments and receivables, filings, financial reporting, hiring and firing employees, and reporting of taxes, among other things.

A recent investigation by Global showed that the defendants engaged in a scheme whereby they defrauded Global by, *inter alia*, establishing competing companies, misappropriating Global's resources and business opportunities, and stealing intellectual property and inventory.  The Barnhills attempted to cover up their misdeeds by thwarting efforts to establish a reliable cost accounting system and providing misinformation to employees and customers.  The scheme has resulted and continues to result in substantial financial injury to Global and to its stability and existence.

## JURISDICTION AND VENUE

1.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 18 U.S.C. § 1964(a) and (c) (RICO), 15 U.S.C. § 1125, and 28 U.S.C. § 1367 (supplemental jurisdiction of state law claims).

2.

Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(a),(b) and (d).

## PARTIES

3.

Plaintiff Global Oil Tools, Inc. (hereinafter "Global") is a Louisiana

corporation, licensed to do business in Louisiana, and domiciled in Houma, Louisiana.

4.

Defendant Wilfred J. "Barney" Barnhill (hereinafter "defendant Wilfred Barnhill") is an individual of the full age of majority and domiciled in Houma, Louisiana.

5.

Defendant Brian A. Barnhill (hereinafter "defendant Brian Barnhill") is an individual of the full age of majority and domiciled in Houma, Louisiana. Defendant Brian Barnhill is the son of defendant Wilfred Barnhill.

6.

Defendant Diane Barnhill (hereinafter "defendant Diane Barnhill") is an individual of the full age of majority and a domiciliary of Houma, Louisiana. She is the wife of defendant Wilfred Barnhill.

7.

Defendant Denise LeBlanc (hereinafter "defendant LeBlanc") is an individual of the full age of majority and a domiciliary of Houma, Louisiana.

8.

Defendant Daniel Triche (hereinafter "defendant Triche") is an individual of the full age of majority and believed to be a domiciliary of Houma, Louisiana.

9.

Defendant Downhole-Surface Manufacturing, L.L.C. (hereinafter "defendant DSM") is a Louisiana limited liability company, which is domiciled in Houma, Louisiana.  Upon information and belief, it is owned by defendant Wilfred Barnhill.

10.

Defendant Barnhill Industries, Inc. d/b/a Global International Tools (defendant GIT") is a Louisiana corporation domiciled in Houma, Louisiana. Upon information and belief, it is owned by defendants Wilfred Barnhill and Diane Barnhill.  Its officers are defendant Wilfred Barnhill and Diane Barnhill.

## **FACTUAL BACKGROUND**

11.

At all times pertinent hereto, Global manufactured wireline tools and downhole flow control systems for the oil and gas industry.  Global sells to United States and international clientele.

12.

In 2005, Global was initially purchased by Grifco International ("Grifco") for $5.3 million.  Global's shareholder and president at the time was defendant Wilfred Barnhill.

13.

In 2007, Lyamec Corporation ("Lyamec") acquired sole ownership of Global from Grifco.  Lyamec's director is Riad Ghariani ("Ghariani").

4

14.

Defendant Wilfred Barnhill remained Global's president until 2011.  As such, he was responsible for management of the company and owed it those fiduciary duties commensurate with his office of president.

15.

Shortly after Lyamec acquired Global, defendant Wilfred Barnhill asserted that he needed additional administrative staff.  After receiving approval to hire an additional person, he hired his wife, Diane Barnhill, to Global's payroll.  No clear job description or title was ever provided to Diane Barnhill.

16.

At the time Lyamec acquired Global, defendant Brian Barnhill was employed by Global as its Vice President, Financial Officer, and Treasurer.  As such, defendant Brian Barnhill was responsible for all financial reporting, payroll, purchasing, tracking physical inventory, signing checks, signing of corporate tax returns, hiring, and marketing.

17.

When Grifco purchased Global in 2005, Global's sales were consistently in the $4 million range, producing hundreds of thousands in profit each year.

18.

By the 2009-2010 tax year, while still under defendant Wilfred Barnhill's management, sales had dropped to just $2.5 million. Global eked out a profit of

$66,000.  This was before the Gulf of Mexico oil spill interfered with local oil production, so it was not a factor in the decrease.

19.

During the 2010-2011 tax year, Global's sales increased to $2.9 million. Yet, Global experienced a significant operating loss of $173,000.

20.

Consequently, Ghariani was concerned about the declining profits and replaced defendant Wilfred Barnhill with Paul McCarley ("McCarley") as president of Global.  Defendant Wilfred Barnhill and defendant Brian Barnhill were retained for management of the day-to-day operations.

21.

On January 11, 2012, defendant Wilfred Barnhill and defendant Diane Barnhill resigned their positions with Global without giving notice to Lyamec.  At the time, defendant Brian Barnhill remained employed by Global.

22.

After defendant Wilfred Barnhill's and defendant Diane Barnhill's departures, Global employees informed McCarley of corrupt and fraudulent behavior by defendants Barnhill and Brian Barnhill in 2011.  Global therefore hired a firm of certified public accountants to conduct an investigation of the Barnhill's conduct and conduct an analysis of Global's financial records.

23.

Defendant Brian Barnhill resigned his offices with Global on or about February 22, 2012—the week prior to commencement of Global's on-site investigation.

24.

The investigation revealed serious misconduct on the part of defendant Wilfred Barnhill and defendant Brian Barnhill.  Based upon that investigation and upon information and belief, defendants engaged in the following conduct and violations of law:

**Establishment of Competing Companies**

25.

On May 24, 2010, defendants Wilfred Barnhill and Diane Barnhill had their company, defendant Barnhill Industries, Inc., register the trade name Global International Tools.  The Louisiana Secretary of State's website designates the type of business as "retail – oil field products."  Defendant Wilfred Barnhill and defendant Barnhill Industries thereafter conducted a competing business under the name of Global International Tools ("GIT").  Accordingly, defendant Barnhill Industries and GIT are referred to herein collectively as "defendant GIT."

26.

Defendant GIT's name, i.e. *Global International Tools*, is substantially similar to Global Oil Tools' name.  Upon information and belief, the Barnhills

transferred Global Oil Tool's phone numbers to their own personal numbers, and when answering the phone simply referred to both companies as Global.  Global International Tools is located in a building just down the street from Global.

27.

Notably, defendant GIT's registered agent is defendant Wilfred Barnhill, and its officers are defendants Wilfred Barnhill and Diane Barnhill.  Its location is given as 231 Ouiski Bayou Drive, Houma, Louisiana 70360, which is Barnhill's residence and less than three miles from Global's offices.  Notably, defendant GIT was registered almost two years prior to defendant Wilfred Barnhill's departure from Global.

28.

Global employees and a certificate of occupancy have confirmed that the building located just down the road from Global at 5413 Highway 311, Houma, LA 70360, is the location out of which GIT is operating.  This fact is also confirmed by the domain registration for "globalinternationaltools.com," which identifies GIT as located at 5413 Highway 311, Houma, LA 70360 and shows defendant Diane Barnhill at that same address as the domain administrator.

29.

Trucks often arrived at Global with deliveries for defendant GIT and were directed by defendant Wilfred Barnhill or defendant Brian Barnhill to the GIT building further down Highway 311.

30.

In January 2011, defendant Wilfred Barnhill started Downhole-Surface

Manufacturing, LLC ("defendant DSM").  Global's employees have identified the

building located at 5413 Highway 311 (also occupied by GIT) as the actual

operating location for defendant DSM.  In fact, "DSM" was lettered on the door

until partway through Global's investigation.

31.

Global employees have stated that defendant Wilfred Barnhill told them

he owned DSM.

**Unlawful Discounts to DSM**

32.

Defendant Wilfred Barnhill had Global sell to defendant DSM at a steep

discount.  Barnhill was charging DSM only slightly more than half of what other

customers paid.   These discounts cost Global at least $151,000 in lost profits on

its sales to DSM.

**Stealing Business Opportunities and Customers**

33.

Defendant DSM and defendant GIT were and may continue to be stealing

business opportunities from Global.

34.

This is evidenced by several examples.  In one case, a Global employee

overheard a telephone conversation in which defendant LeBlanc, while a Global

employee, directed business to defendant DSM while still employed by Global. Defendant LeBlanc informed the other party (falsely) that Global did not make the tool they were requesting and provided them with defendant DSM's phone number as a company that could. Defendant LeBlanc is believed to currently be employed by defendant Wilfred Barnhill at defendants DSM and/or GIT.

35.

Also, when Global's accounting firm reviewed defendant DSM's client records, they found defendant DSM's standard shipping address of P.O. Box 801 in Houma, Louisiana. A Freedom of Information Act request showed that the P.O. Box is a personal P.O. Box, which, under the circumstances, likely belongs to one of the Barnhill defendants.

36.

DSM's client record also showed a second shipping address, 799 Lane 9, Powell, WY 82435, which belonged to a customer of Global in Wyoming named Rocky Mountain Oilfield Services ("Rocky Mountain"). This suggested that defendant DSM made at least one purchase from Global which DSM caused Global to ship to Rocky Mountain.

37.

Given the extreme discount defendant DSM was receiving on its purchases, it could easily add sizeable margins and still undercut Global's pricing.

38.

As another example, a March 2012 email from the general manager of a Global customer, Kuster Co., to defendant Wilfred Barnhill at his Global email address was discovered in Global's email system.  The email placed an order for three shock absorbers.  However, the original email which quoted the order was sent by defendant Brian Barnhill from his GIT email address ("ginttools@yahoo.com").  The email identifies the quote as coming from "Global International Tools."  Defendant Brian Barnhill was still Global's CFO and employee at that time and Kuster was an existing client of Global.

39.

Notably, Kuster purchased $2,520 in 2009, $7,170 in 2010, and nothing in 2011.  This is the same pattern indicated with the Wyoming customer, Rocky Mountain.

40.

Global also obtained a March 21, 2012 delivery ticket from GIT to GE Oil & Gas ("GE") in the amount of $69,180.  GE had purchased Woodgroup in 2011.  Woodgroup had been Global's client since at least 2009.  GE's recent purchases from Global have all been related to repairs and maintenance of Global products which they had previously purchased.  The last time they purchased original equipment was August 26, 2011.  The fact that in March 2012 they were purchasing new equipment from defendant GIT indicates that defendants

Barnhill and GIT diverted this business opportunity from Global, denying Global almost $70,000 in sales.

41.

Furthermore, in a June 6, 2011 email to Ghariani, defendant Brian Barnhill identified a new client with great potential.  In the email, defendant Brian Barnhill stated that the new client, Freedom Well Services, L.L.C., would be buying all of their tools and equipment from Global Oil Tools and that he thought it was going to create about $1 million or more in sales for the rest of 2011 and that the new client would be a good customer in the future.  That client purchased $128,306 between May 31, 2011 and September 27, 2011, referencing multiple purchase order numbers and quote numbers.  However, that customer abruptly quit purchasing from Global after September 27, 2011, and the anticipated sales of $800,000 never materialized.

42.

The purchasing history of Global's top five customers from 2009 through 2011 showed that the top four clients in 2011 were all new to Global.  The second largest client was DSM, Barnhill's company.  These four clients represented almost half of Global's sales in 2011.  The fifth client was a returning customer whose purchases were generally in line with previous years.

43.

However, there were eight other clients who were top 5 customers in previous years.  Two of those clients' total purchasing increase was just $15,000.

On the other hand, the other six clients purchased $660,000 in 2010 and only $220,000 in 2011, a total decrease in purchases of $440,000, representing a loss of over two thirds of the 2010 volume.

44.

Global's investigation indicates that Global is losing the business of many of its largest customers.  Based on the conduct addressed above, upon information and belief, it is believed that the defendants are to blame.

**Use of Global to Pay Competing Businesses' Expenses**

45.

Defendant Wilfred Barnhill, defendant Brian Barnhill, and defendant GIT have caused Global to pay for products shipped to defendant GIT.

46.

For example, in March 2011, Global was contacted by Valve and Automation Specialty, LLC ("V&A") regarding payment of outstanding invoices. When Global employees inspected the invoices they found that they reflected deliveries to defendant GIT, but were being billed to Global.  Specifically, Invoice No. 705259 dated August 11, 2011 was issued originally as both billed and shipped to "Global International Tools," P. O. Box 4196, Houma, LA 70361.  This P.O. Box is also the address provided by defendant Wilfred Barnhill, Diane Barnhill, and defendant Brian Barnhill as their mailing address for payroll purposes.

47.

The August 11, 2011 invoice was later reissued to "Global Oil Tools, P.O. Box 3580, Houma, LA 70361" with the "Ship To" address showing "Global Oil Tools, P.O. Box 4196, Houma LA 70361."  Although the name and address were changed in the "Bill To" section, the "Ship To" section still reflected that the products were shipped to the Barnhills.

48.

V&A Invoice No. 705330, dated August 22, 2011, was issued as "Bill To" "Global Oil Tools, P.O. Box 4196, Houma, LA 70361" and "Ship To" "Global International Tools, P.O. Box 4196, Houma, LA 70361."  The Barnhill's P.O. Box is shown as the address for both fields, and defendant GIT is shown as the recipient, but Global is the company that was required to pay the invoice.

49.

According to V&A's representative, when they originally sent these invoices to GIT, V&A received a call from defendant LeBlanc who told V&A that if they wanted to get paid for the invoices, they needed to change the names on them to "Global Oil Tools," which V&A did.

**Theft of Global Labor, Inventory, Tools, and Intellectual Property**

50.

Defendant Wilfred Barnhill demanded that Global's employees treat defendant DSM as a priority without informing them that he had an interest in the business.

51.

Global employees were directed to conduct work which was not for Global. One employee recalled working on fourteen blow out preventers and numerous lubricators for defendant Wilfred Barnhill and this work was not for Global.

52.

Additionally, according to Global employees, defendant Wilfred Barnhill directed Global's machinists, assemblers, and quality control employees to perform their standard functions in ways which undermined the efficiency of Global and enabled parts that Global's employees had created, to disappear without record.

53.

Specifically, defendant Wilfred Barnhill directed employees to manufacture standard Global inventory without the usual identifying job code. Instead, he directed the employees to reference Job Code G0000, which is a catch-all code usually reserved for maintenance on equipment or for miscellaneous work after a job has been closed.  It is an administrative code, not a job code.

54.

After a part has cleared quality control, Global stencils it with the job code, month of manufacture, part number, and a brief description.  In this way, Global can trace a part to the specific job under which it was created.  Parts manufactured under Job No. G0000 were not stenciled as Global's property

because this process would have required a job code.  Consequently, there was no way to properly stencil and trace these items.  Instead, according to Global's employees, the parts were completed and left with no identifying marks.  These parts would then mysteriously disappear overnight.  The work performed under the G0000 code was not for Global but for defendant Wilfred Barnhill and was at defendant Wilfred Barnhill's direction.

55.

According to Global employees, defendant LeBlanc also directed them to work on tools for defendant Wilfred Barnhill and defendant Triche frequently arrived at Global and departed with work products or tools.  One employee observed that Global was a "tool shopping mall" for defendants LeBlanc and Triche.

56.

This abuse and theft of employees' time and labor by defendant Wilfred Barnhill likely cost Global around $101,348 in 2011, not including any factory overhead.  Based upon information available, this is a reasonable and conservative estimate and does not even include some indirect costs usually allocable to inventory.

57.

Defendant Wilfred Barnhill also paid a Global machinist $2,700-$2,750 cash in December 2011 to clandestinely produce parts on Global's equipment after standard working hours.  The employee manufactured three pump-n-subs,

finished two partially manufactured blow-out preventers, and manufactured a "wild brush." According to the employee, these parts were manufactured from proprietary designs owned by Global, but the work was not for Global.

58.

Large volumes of inventory and tools were stolen from Global.  According to Global employees, inventory had been steadily disappearing.  Often this would be overnight, while the employees were gone.

59.

During 2011, defendant Wilfred Barnhill directed two Global employees to box up tools which were stored in the attic.  These tools were a combination of inventory and obsolete tools vital to manufacturing hard-to-find inventory.  The latter are irreplaceable.  Defendant Triche loaded two pallets of these tools/parts onto a Global trailer and drove off with them.  One Global employee stated that he and another employee filled two pallets six feet high with boxes and placed the pallets by the back door of the facility where they would be easy to load onto a truck.  The pallets of parts disappeared shortly thereafter.

60.

Also during 2011, defendant Wilfred Barnhill directed a Global employee to drive a load of unidentified boxes to a storage unit located at Blue Marlin Boat and RV Storage located at 296 South Hollywood Street, Houma, Louisiana, and unload them.  The Global employee reported that the storage unit had other boxes already stored in it, along with garbage drums filled with iron.  The Global

employee also stated that he had previously driven defendant Wilfred Barnhill to this same unit to pick up a power washer for defendant Wilfred Barnhill to use at his home.

61.

In May 2011, three grocery carts of parts were removed from Global's quality control area because they needed updated stenciling.  The parts were all viable, but needed some identification clarification.  These inventory items were never contained in the May 2011 inventory.  The carts were left near the back door of the facility and disappeared one night about a month later.

62.

Defendant Triche, who is believed to be working for defendant Wilfred Barnhill at defendant DSM and/or defendant GIT, has frequently arrived at Global, taken inventory, and left, even after his separation from Global. Defendant Wilfred Barnhill would not allow anyone to question defendant Triche's actions.

63.

The theft of the inventory, excluding blow-out preventers, which can be identified at this time is valued at $86,964.

64.

An investigation by the Terrebonne Parish Sheriff's Office confirmed that a list of inventory totaling approximately $86,964 which Global provided to the

Terrebonne Parish Sheriff's Office was located by the Sheriff's Office in defendant

Wilfred Barnhill's storage unit.

65.

Global used to maintain a room with "samples," which were examples of

every tool that Global manufactures and could be used by Global employees if

there was ever an issue with interpreting a tool's manufacturing blueprint.  These

samples are invaluable to Global, representing its entire catalog and intellectual

property.  These tools are unique, difficult to locate, and no longer in production.

The contents of that room have disappeared.

66.

Each of Global's products has a related set of blueprints which are stored

on site.  Global's employees believe that defendant Wilfred Barnhill and

defendant LeBlanc have been systematically copying these blueprints and

removing them for defendant DSM's and/or GIT's use.  Removal of the blueprints

is a misappropriation and/or conversion of Global's intellectual property.  There

are two specific incidents which support the allegation:

a.       On several occasions, a Global employee was asked by defendant

Wilfred Barnhill and defendant LeBlanc to make copies of numerous prints and

tool/print folders, which was very unusual.  That employee gave the resultant

copies directly to defendant Wilfred Barnhill or defendant LeBlanc.  The contents

of one of these folders contained all the step by step processes to make Global's

tools and descriptions and specific detailed diagrams of tools.  Such are

19

considered confidential property of Global and reproduction of this material could allow another company to duplicate the production and manufacturing of the tools for which Global is certified to produce.

      b.     In late December 2011, Global's employees left on a Friday with nothing on the photocopier.  When they returned on Monday, there was a print on the copier, turned the wrong direction so it wouldn't print properly.  The employees believed that defendant LeBlanc had been in the office over the weekend copying Global's prints.

67.

      In 2011, four three inch blow out preventers were manufactured and not sold by Global.  They should have been stored in its warehouse as inventory.  However, none could be found.  Their total value is $35,600.

68.

      Notably, on one occasion, defendant Wilfred Barnhill attempted to record a $60,000 fuel bill as an expense of Global, but it was questioned and denied.  Global does not use fuel.  However, defendant Wilfred Barnhill is an avid marlin fisherman and owns a fishing boat.

**Other Acts**

69.

      The attention defendant Wilfred Barnhill and defendant Brian Barnhill gave to their scheme and defendant DSM and defendant GIT caused them to neglect or intentionally fail to perform their job duties at Global.

70.

Defendant Wilfred Barnhill and defendant Brian Barnhill left Global's finances in disarray.  Almost every vendor's account was at least 90 days past due.  Despite the fact that the financial statements showed cash balances, the checking accounts had almost no deposits.

71.

Also, defendant Wilfred Barnhill and defendant Brian Barnhill took the following deductions from Global employees' paychecks but failed to make the required contributions in recent months: (a) 401(k) deductions; (b) state garnishments; (c) short term/long term disability; and (d) uniforms.

72.

These failures resulted in penalties and interest on late tax payments to both the federal and state governments.

73.

Astonishingly, in March 2012, defendant Wilfred Barnhill, defendant Brian Barnhill, and Diane Barnhill had an attorney send a demand letter to Global requesting that Global pay outstanding pay checks to them dating back as far as June 24, 2011.  The letter asserted that the Barnhills were holding the outstanding checks because Global did not have sufficient funds to negotiate the checks.  As stated, the Barnhills were in control of Global's finances at all such pertinent times.  In fact, defendant Brian Barnhill was responsible for payroll.  Even after the Barnhills formed defendant GIT, defendant Brian Barnhill

continued writing paychecks to himself, defendant Diane Barnhill, and defendant Wilfred Barnhill, even though he knew they were also employed by defendant GIT.

74.

Global was forced to pay approximately $800,000 in debt which accumulated due to defendant Wilfred Barnhill's and defendant Brian Barnhill's acts and omissions.

**The Attempted Cover Up**

75.

The defendants attempted to cover up their misdeeds and to shift blame to others.

76.

 Prior to their respective departures from Global, defendant LeBlanc and defendant Wilfred Barnhill repeatedly told Global employees that Global was going to have to close its doors and they should find new jobs as soon as possible.

77.

Defendant Wilfred Barnhill told Global employees that it was Ghariani's fault that Global didn't have the right tools and materials and could not give out raises.

78.

Defendant Brian Barnhill erased data, including email, from several of Global's computers, including his primary computer.  He also had file cabinets

removed from the offices during late 2011 and directed employees to dispose of "old documents" in the on-site dumpster.

79.

Also, when Lyamec acquired Global, Global had no cost accounting procedures in place.  Such procedures would have ensured that all of Global's costs of manufacturing were being captured or allocated in a methodical manner so the true cost of manufacturing each inventory item would be known.  This would ensure that Global knew exactly how profitable each sale was.

80.

A cost accounting system would also provide accurate data collection for financial reporting of costs of goods sold and for assessing operations.  It would further provide for informed decision making about product lines, pricing, streamlining, etc.

81.

Therefore, in mid-2007, Ghariani decided to have Global purchase the E2 Shop System ("E2"), a cost accounting system.  Ghariani instructed defendant Wilfred Barnhill to implement E2 as quickly and comprehensively as possible.

82.

However, defendant Wilfred Barnhill and defendant Brian Barnhill resisted.  By 2009, the E2 system was still not in place.

83.

Subsequent attempts by Global to ensure the E2 system was properly in place and utilized correctly received resistance from defendant Wilfred Barnhill and defendant Brian Barnhill.  Global learned that they were hindering its proper implementation.

84.

Almost five years after the purchase of the E2 system, defendant Wilfred Barnhill and defendant Brian Barnhill managed to prevent Global from having a working cost accounting system, and its financial data continued to be unreliable. The incomplete data made it difficult to assess the validity of the transactions Global engaged in, especially with defendant DSM and defendant GIT.  The defendants' efforts ensured that Global and Lyamec were receiving incomplete and unreliable financial reports.

**<u>Count I – RICO § 1962(c)</u>**

85.

Paragraphs 1 through 84 are incorporated herein by reference.

86.

This Count is against all defendants.  The defendants are "persons" as defined in 18 U.S.C. § 1961(3).  They are collectively referred to as the "RICO Defendants."

**The Association-in-Fact RICO Enterprise**

87.

All of the RICO Defendants collectively are an association-in-fact enterprise as defined in 18 U.S.C. § 1961(4), all of whose activities affect interstate commerce.  Upon information and belief, defendants DSM, GIT, Wilfred Barnhill, Brian Barnhill, Diane Barnhill, LeBlanc, and Triche formed, maintained, and continue to maintain a close interlocking association for purposes of defrauding Global and committing the unlawful activity as set forth in paragraphs 1 through 84.

**Roles of the Individual RICO Persons in the Association-in-Fact Enterprise**

88.

Defendant Wilfred Barnhill was President of Global until 2011 and managed it until such time.  Defendant Wilfred Barnhill effectively stole labor totaling at least $101,000 in 2011 from Global by directing its employees to perform tasks from which Global received no benefit, but defendant Wilfred Barnhill and his companies did.  He also fraudulently misappropriated or converted Global's inventory, parts, tools, intellectual property, customers, and employees' labor, and destroyed or directed employees to destroy business records.  Defendant Wilfred Barnhill established and owned defendant DSM.  He thereafter had Global sell to defendant DSM at steep discounts.   Defendant Wilfred Barnhill used defendant GIT and defendant DSM to compete with Global, usurp its business opportunities, and to pass off GIT's operating expenses

as Global's when Global received no benefit therefrom. Defendant Wilfred Barnhill further directed Global's employees to perform their standard functions in ways which undermined the efficiency of Global and directed or conspired with defendant LeBlanc and defendant Triche to engage in some of the activities noted herein. Barnhill caused Global to take deductions from employees' pay checks and to not make the associated contributions. Defendant Wilfred Barnhill attempted to cover up the defendants' illicit activities as noted herein. He conspired with the other defendants to engage in these activities.

89.

Defendant Brian Barnhill was Vice President, Financial Officer, and Treasurer of Global. He used his offices to thwart Global's investigation and to act as the financial and information gate keeper. This allowed defendants' scheme to continue for years. As noted, *supra*, defendant Brian Barnhill also fraudulently misappropriated and/or converted Global inventory. He used and helped defendant GIT to compete with Global and usurp its business opportunities. Defendant Brian Barnhill destroyed data, including emails, removed file cabinets, and directed employees to dispose of documents. He conspired with the other defendants to commit all of the acts noted herein.

90.

Defendant Diane Barnhill was an officer of defendant Barnhill Industries, which registered GIT and did business under that trade name. Upon information

26

and belief, defendant Diane Barnhill conspired with the other defendants to commit all of the acts noted herein.

91.

Defendant LeBlanc was an employee of Global and upon information and belief is currently employed by defendants Wilfred Barnhill, and/or DSM, and/or GIT.  She engaged in the conduct noted herein and generally acted contrary to the best interests of Global while employed there.  She conspired with the other defendants to commit all of the acts noted herein.

92.

Defendant Triche was an employee of Global and upon information and belief is currently employed by defendants Wilfred Barnhill, and/or DSM, and/or GIT.  He engaged in the conduct noted herein and generally acted contrary to the best interest of Global while employed there.  He conspired with the other defendants to commit all of the acts noted herein.

93.

Defendant GIT was a company owned by defendants Wilfred Barnhill and Diane Barnhill, who are its officers, while they were employed by Global. Defendant GIT was formed for the purpose of fraudulently diverting customers, income, and proceeds from Global and to usurp Global business opportunities.  It directly competed with Global using fraudulent means and fraudulently misappropriated and/or converted assets of Global.  Defendant GIT conspired with the other defendants to commit all of the acts noted herein.

94.

Defendant DSM was a company owned by defendant Wilfred Barnhill while he was employed by Global.  Defendant DSM was formed for the purpose of fraudulently diverting customers, income, and proceeds from Global and to usurp Global business opportunities.  It obtained steep discounts from Global by having defendant Wilfred Barnhill cause Global to sell products to defendant DSM at the discounted rate.  It competed with Global using fraudulent means and fraudulently misappropriated and/or converted property of Global, including intellectual property.  Defendant DSM conspired with the other defendants to commit all of the acts noted herein.

95.

By the foregoing conduct, the RICO Defendants all jointly defrauded Global and each RICO Defendant knowingly furthered the execution of the RICO enterprise.

**The Racketeering Activity**

96.

The RICO Defendants' activities constitute a pattern of racketeering activity as set forth in 18 U.S.C. § 1961(5).  Many of the activities of the RICO Defendants constitute wire fraud in violation of 18 U.S.C. § 1343, mail fraud in violation of 18 U.S.C. § 1341, and transportation of stolen goods or goods converted or taken by fraud in violation of 18 U.S.C. § 2314.

97.

Such instances of the wire fraud predicate acts include:

a.      The aforementioned March 2012 email from defendant Brian Barnhill's GIT email address ("ginttools@yahoo.com") to Kuster Co. quoting an order for shock absorbers;

b.      The March 2012 email from Kuster Co. regarding the quote sent to defendant Wilfred Barnhill's Global email address ("wjbarnhill@globaloiltools.com");

c.      Any emails between the RICO Defendants and any out-of-state third parties in furtherance of their scheme;

d.      Any emails between the RICO Defendants and any out-of-state customers of Global, DSM, or GIT in furtherance of the scheme;

98.

Such instances of the mail fraud predicate acts include:

a.      Mailings to Rocky Mountain Oilfield Services at 799 Lane 9, Powell, WY 82435;

b.      The mailing of the August 11, 2011 V&A Invoice Number 705259;

c.      The mailing of the reissued August 11, 2011 V&A Invoice Number 70529;

d.      The mailing of the August 22, 2011 V&A Invoice No. 705330;

e.      Any mailings between the RICO Defendants and themselves or any third parties, including the other wrongdoers, in furtherance of their scheme;

f.      Any mailing between the RICO Defendants and any customers of Global, DSM, or GIT in furtherance of the scheme.

99.

Any interstate shipment of the blow out preventers, each with a value of $8,900, would constitute a violation of 18 U.S.C. § 2314.   The evidence also indicates that the RICO Defendants shipped over $5,000 worth of shock absorbers to Kuster Company, a California company, pursuant to a purchase order in March 2012.

100.

All of the aforementioned predicate acts in paragraphs 96 through 99 are related.  They had a similar purpose (i.e., defrauding Global), involved the same participants, involved the same victim (Global), and were not isolated events.

101.

The racketeering predicate acts amounted to continued criminal activity dating back several years.  They also pose a threat of continued criminal activity. In fact, Global recently received a May 7, 2012 invoice for concrete services, which Global did not receive.  The invoice was mailed to Global and listed it as the customer.  However, it also stated the "Job ID" as "231 Quiski (sic) Bayou" and the "Purchase Order" as  "Wilfred Barnhill."  Also, Global recently received a call from a machining company requesting that Global pick up several blow-out preventers.  However, the blow-out preventers were not Global's.

102.

These predicate acts furthered the RICO Enterprise and directly and proximately resulted in injury to Global.

**The RICO Enterprise's Scheme to Defraud Global**

103.

The RICO Enterprise effectively stole at least $101,000 in labor from Global by directing its employees to perform tasks from which Global received no benefit.

104.

The RICO Enterprise engaged in theft of inventory, tools, intellectual property, and business records.

105.

The RICO Enterprise established defendant DSM and defendant GIT while the individual RICO defendants were still employed by Global.  The RICO Enterprise set up defendant DSM and defendant GIT just down the street from Global.

106.

The RICO Enterprise sold to defendant DSM at steep discounts.  The RICO Enterprise used defendant GIT to directly compete with Global while the individual defendants were employed by Global.  This allowed the RICO Enterprise to usurp Global's business opportunities for the benefit of the

enterprise.  The RICO Enterprise also passed off its operating expenses as belonging to Global when Global received no benefit from them.

107.

The RICO Enterprise's scheme included directing Global's customers to purchase from defendant GIT or causing them to unknowingly do so.  This resulted in reduced sales volume for Global.

108.

The RICO Enterprise undermined the proper implementation of the E2 system to cover up the enterprise's illicit activities.  By doing so, the RICO Enterprise denied Lyamec and Global an objective source of operational and financial data.  Lyamec and Global accordingly had to rely upon the information provided by the RICO Enterprise, which was incomplete and unreliable.

109.

The RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c) are direct and proximate causes of Global's injuries and damages.

## Count II – RICO § 1962(c)

Paragraphs 1 through 109 are incorporated herein by reference.

110.

This Count is against defendants Wilfred Barnhill, Diane Barnhill, and Brian Barnhill.  These individuals are "persons" as defined in 18 U.S.C. § 1961(3). They are collectively referred to as the "individual RICO Defendants."

111.

Defendant GIT and defendant DSM are enterprises as defined in 18 U.S.C. § 1961(4), whose activities affect interstate commerce.

112.

As evidenced by the foregoing facts, the individual RICO Defendants established defendants GIT and DSM and/or conducted GIT's and DSM's affairs through the aforementioned pattern of racketeering activity, including those predicate acts stated in paragraphs 96 through 99.

**Count III – RICO § 1962(d)**

113.

The allegations of paragraph 1 through 112 are incorporated herein by reference.

114.

This Count is against all RICO Defendants.

115.

As detailed above, the RICO Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).  The RICO Defendants knowingly and intentionally furthered the conspiracy.  The object of the conspiracy was to establish competing businesses and to defraud Global out of substantial sums of money by stealing inventory, tools, intellectual property, business records, customers, and assets by the conduct set forth above.

116.

The RICO Defendants intentionally conspired and agreed to conduct the affairs of the association-in-fact enterprise through a pattern of racketeering activity.  The individual defendants also intentionally conspired and agreed to conduct the affairs of DSM and GIT through a pattern of racketeering activity.  In each instance, at least two of the defendants agreed to commit a substantive RICO offense and the other defendants knew of and agreed to the overall objective of the RICO offense and agreed to facilitate that objective.

117.

The RICO conspiracy and the overt acts committed in furtherance thereof directly and proximately caused injury to Global's business and property as set forth above.

## Count IV – Violations of 15 U.S.C. § 1125 ("Lanham Act")

118.

Paragraphs 1 through 84 are incorporated herein by reference.

119.

This Count is against all defendants as they violated or conspired to violate 15 U.S.C. § 1125(a).

120.

15 U.S.C. § 1125(a) provides, in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false

designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .
> . . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

### 121.

Defendants' use of the words Global International Tools, Inc. is likely to cause, and upon information and belief has caused, confusion and deception as to the affiliation, connection, or association of defendant GIT and its goods, services, and commercial activities with Global Oil Tools, Inc.

### 122.

Adding to the confusion and deception is the fact that: defendant GIT and the other defendants referred to defendant GIT as "Global" when dealing with third parties; shared the same officers (defendants Wilfred Barnhill and Diane Barnhill) for much of the time pertinent hereto; the defendants located defendant GIT just down the street from Global (as noted, trucks have often arrived at Global with deliveries for defendant GIT); defendants conducted business for defendant GIT while employed by Global and using Global's resources and email accounts; and defendants usurped Global's business and customers.

123.

Pursuant to 15 U.S.C. § 1117(a), Global is entitled to an award of attorney fees and costs.

**Count V – Violations of the Louisiana Unfair Trade Practices Act**

124.

Paragraphs 1 through 84 are incorporated herein by reference.

125.

This Count is against all defendants as they violated or conspired to violate La. R.S. 51:1401, *et seq.*, the Louisiana Unfair Trade Practices Act.

126.

The conduct in paragraphs 1 through 84 constitutes unfair methods of competition and unfair and deceptive practice in the conduct of the defendants' trade and commerce and constitutes violations of the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et seq.* Pursuant to La. R.S. 51:1409, a copy of this Complaint is being mailed to the Louisiana Attorney General.

127.

Defendants' practices and conduct offends the established public policy of Louisiana and is unethical, oppressive, unscrupulous, and substantially injurious to consumers and competitors.

128.

The individual defendants herein have also used the defendant companies to engage in said unfair trade practices.

129.

Global suffered loss of money and other damages as a result of defendants'
unfair trade practices.

130.

Pursuant to La. R.S. 51:1409(A), Global is entitled to recover three times
their damages and reasonable attorney fees and costs associated with the
prosecution of this action.

## Count VI – Breach of Fiduciary Duties

131.

Paragraphs 1 through 84 are incorporated herein by reference.

132.

This Count is against all defendants because they violated or conspired to
violate fiduciary duties.

133.

Defendants Wilfred Barnhill and Brian Barnhill were officers of Global
until January 2012 and February 2012, respectively.  As such, they both stood in
a fiduciary relation to Global and its shareholder, Lyamec.  They had the duty to
discharge their duties in good faith, and with that diligence, care, judgment and
skill which ordinarily prudent men would exercise under similar circumstances in
like positions.  *See* La. R.S. 12:91.

134.

Defendants Diane Barnhill, LeBlanc, and Triche were employees of Global at all times pertinent to this Complaint.  As such, they owed fiduciary duties to Global and were duty bound not to act in antagonism or opposition to the interest of Global.  They had a duty of loyalty and faithfulness to Global.

135.

The foregoing allegations demonstrate that defendants Wilfred Barnhill, Diane Barnhill, Brian Barnhill, LeBlanc, and Triche engaged in some or all of the following: abusive self-dealing; abuse of control of Global; transactions involving conflicts of interest; usurpation of Global's business opportunities; and misappropriation and/or conversion of Global's assets, including inventory, intellectual property, and labor.

136.

Such constitutes a breach of the individual defendants' fiduciary duties, duties of good faith, and duties of loyalty to Global.

137.

The individual defendants conspired with each other in breach of their respective fiduciary duties.  Likewise, defendants DSM and GIT conspired with the individual defendants in breach of their respective fiduciary duties.   All defendants are therefore liable for breach of fiduciary duties.

138.

The breaches of fiduciary duties were intentional and dishonest and aimed at harming Global.  Global suffered injury and damages as a result of the defendants' breaches of fiduciary duties.

## Count VII – Civil Fraud

139.

Paragraphs 1 through 84 are incorporated herein by reference.

140.

This Count is against all defendants because they committed or conspired to commit fraud.

141.

The allegations in paragraphs 1 through 84 show that defendants committed fraud and/or conspired to commit fraud upon Global, depriving it of its assets, profits, labor, and business opportunities.

142.

Such fraud includes, but is not limited to the following:  failing to disclose defendants' actions and ownership interests in defendant DSM and defendant GIT to Global; using deceit to usurp Global's business opportunities and to compete with Global while the individual defendants were employed by Global; causing or conspiring to cause Global to sell to DSM at steep discounts without disclosing Barnhill's interest in DSM to Global; directing employees to clandestinely produce parts on Global's equipment after standard working hours

using Global's proprietary designs; arranging and/or directing Global employees to assist in misappropriation of Global's assets; misappropriating Global's assets; erasing data, removing file cabinets, and directing employees to dispose of documents; and causing Global to pay for products shipped to GIT.

143.

To hide their individual frauds and overall scheme to defraud Global, defendants also committed fraud and/or conspired to commit fraud by undermining the E2 system and thereby providing false and inaccurate information to Global.

### Count VIII – Misappropriation and Conversion

144.

The allegations in paragraphs 1 through 84 are incorporated herein by reference.

145.

This Count is against all defendants.

146.

The allegations in paragraphs 1 through 84 show that defendants misappropriated and converted, or conspired to misappropriate or convert, Global's assets, including its intellectual property, inventory, tools, parts, business records, labor, and business opportunities.

**Count IX – Tortious Interference with Business Relations**

147.

Paragraphs 1 through 84 are incorporated herein by reference.

148.

This Count is against all defendants.

149.

Defendants tortiously interfered with Global's business relations or conspired to do so by wantonly and maliciously interfering with and disturbing Global's business relationships with its customers without any justification for doing so.

**<u>Jury Demand</u>**

150.

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Global demands trial by jury.

WHEREFORE, plaintiff Global Oil Tools, Inc. prays for judgment in its favor and against defendants Wilfred J. Barnhill, Brian A. Barnhill, Diane Barnhill, Denise LeBlanc, Daniel Triche, Downhole-Surface Manufacturing, L.L.C., and Barnhill Industries, Inc. as follows:

1.      For all damages to which Global is entitled against defendants Wilfred J. Barnhill, Brian A. Barnhill, Diane Barnhill, Denise LeBlanc, Daniel Triche, Downhole-Surface Manufacturing, L.L.C., and Barnhill Industries, Inc.,

and each of them solidarily, in as yet an undetermined amount, but including treble damages pursuant to 18 U.S.C. § 1962(c) and La. R.S. 51:1409(A);

2.     For all costs and attorney fees incurred in the investigation and litigation of this matter pursuant to 18 U.S.C. § 1964(c), 15 U.S.C. § 1117(a), and La. R.S. 51:1409(A).

3.     For a permanent injunction enjoining defendants Wilfred J. Barnhill, Brian A. Barnhill, Diane Barnhill, Denise LeBlanc, Daniel Triche, Downhole-Surface Manufacturing, L.L.C., and Barnhill Industries, Inc. from engaging in further racketeering activity pursuant to 18 U.S.C. § 1964 and from engaging in unfair trade practices.

4.     For a permanent injunction ordering defendants Wilfred J. Barnhill, Brian A. Barnhill, Diane Barnhill, Denise LeBlanc, Daniel Triche, Downhole-Surface Manufacturing, L.L.C., and Barnhill Industries, Inc. to return all of Global's assets, including any inventory, tools, parts, and blueprints, and all copies thereof; prohibiting them from copying, replicating, misappropriating, and/or utilizing in any way Global's assets, including its confidential or intellectual property; and prohibiting defendants from using the name Global International Tools, Inc. or Global;

5.     For an accounting from defendants of all benefits, consideration, and profits received as a result of defendants' violations noted herein;

6.     For an order of divestiture of any interest, money, obligations, or otherwise, wrongfully obtained, directly or indirectly, from Global;

7.     For a preliminary injunction ordering defendants Wilfred J. Barnhill, Brian A. Barnhill, Diane Barnhill, Denise LeBlanc, Daniel Triche, Downhole-Surface Manufacturing, L.L.C., and Barnhill Industries, Inc. to return all of Global's property, including, but not limited to, any inventory, tools, parts, and blueprints, and all copies thereof; enjoining defendants from copying, replicating, misappropriating, or utilizing such property in any way, including in defendants' current businesses; enjoining defendants from using the name "Global" or "Global International Tools, Inc." and enjoining defendants from interfering with Global's business/contractual relationships.

8.     For any and all other relief to which Global is entitled by law or which this Court may deem equitable and proper.

Respectfully submitted,

HYMEL DAVIS & PETERSEN, L.L.C

s/ Glen R. Petersen_____
L. J. Hymel (LBN 7137)
Michael Reese Davis (LBN 17529)
Glen R. Petersen (LBN 10473)
Tim P. Hartdegen (LBN 27496)
10602 Coursey Blvd.
Baton Rouge, Louisiana 70816
Phone: (225) 298-8118
Fax:  (225) 298-8119

Counsel for Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

GLOBAL OIL TOOLS, INC., AND                    CIVIL ACTION

VERSUS                                          NO.:

WILFRED J. BARNHILL, BRIAN                      SECTION:
A. BARNHILL, DIANE BARNHILL,
DOWNHOLE-SURFACE MANUFACTURING
L.L.C., AND BARNHILL INDUSTRIES, INC.

## DECLARATION OF PAUL MCCARLEY

I, Paul McCarley, submit this declaration under penalty of perjury pursuant to 28

U.S.C. § 1746.

I am President of Global Oil Tools, Inc. ("Global"). I have personal

knowledge of Global's investigation regarding the matters addressed in the

foregoing Complaint. I have read the foregoing Complaint, and declare under

penalty of perjury that all of the allegations of fact contained therein are true and

correct to the best of my knowledge, information and belief.

Executed this _13_ day of June, 2012.

_____
Paul McCarley

44