UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


GLOBAL OIL TOOLS                              CIVIL ACTION


VERSUS                                        NO: 12-1507

                                              SECTION: "J" (4)
BARNHILL, ET AL.


**ORDER AND REASONS**

Before the Court are Defendants Wilfred Barnhill, Brian
Barnhill, Diane Barnhill, Downhole-Surface Manufacturing, LLC,
and Barnhill Industries, Inc. d/b/a Global International Tools
(collectively, "the Barnhill Defendants")'s **Motion to Compel
Arbitration and Stay Proceedings (Rec. Doc. 35)**, Plaintiff Global
Oil Tools ("Global Oil")'s opposition to same **(Rec. Doc. 55)**,
Defendants' reply thereto **(Rec. Doc. 60)**, and Plaintiff's
surreply to same **(Rec. Doc. 89)**. Defendants' motion is set for
hearing on September 26, 2012, on the briefs without oral
argument. Having considered the motions and legal memoranda, the

1

record, and the applicable law, the Court finds that Defendants' motion should be **DENIED** for the reasons set forth more fully below.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

This action arises out of claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.*, the Lanham Act, 15 U.S.C. § 1125 *et seq.*, state law claims for breach of fiduciary duties, civil fraud, misappropriation and conversion, tortious interference with business relations, and claims under the Louisiana Unfair Trade Practices Act, La. Rev. Stat. § 51:1401. On July 13, 2012, Plaintiff filed the instant suit naming as Defendants Wilfred Barnhill, Brian Barnhill, Diane Barnhill, Downhole-Surface Manufacturing, LLC, Global International Tools, Denise Leblanc, and Daniel Triche.

Plaintiff's complaint alleges that Global Oil is a company that manufactures wireline tools and downhole flow control systems for the oil and gas industry. In 2005, Global Oil was purchased by Grifco International, Inc. ("Grifco"). At that time, Wilfred Barnhill was Global Oil's reported president and shareholder. Brian Barnhill, Wilfred Barnhill's son, was the reported vice-president, financial officer, and treasurer of Global Oil. In 2007, Lyamec Corp., Inc. ("Lyamec") acquired

ownership of Global Oil from Grifco. Wilfred and Brian Barnhill (collectively, "the Barnhills") remained in their respective leadership/management positions following the acquisition. Shortly thereafter, Diane Barnhill, Wilfred Barnhill's wife, reportedly became an employee of Global Oil as a part of the administrative staff. Wilfred Barnhill is reported to have remained in his position as president until 2011, resigning completely from Global Oil in January 2012. Brian Barnhill remained employed by Global Oil until February 2012. Diane Barnhill resigned in January 2012.

The complaint reports that in 2005 the average sales of Global Oil remained in the range of $4 million; however, by the 2009 - 2010 tax year, average sales had dropped to $2.5 million. In the 2010 - 2011 tax year, average sales rose to $2.9 million but were coupled with large operating losses. In conjunction, the complaint alleges that on May 24, 2010, Wilfred and Diane Barnhill had their company, Barnhill Industries, register the trade name Global International Tools ("GIT"), which, thereafter, allegedly engaged in competing business with Global Oil. The complaint further alleges that in January 2011, Wilfred Barnhill also registered the trade name Downhole-Surface Manufacturing ("DSM"), another competing company.

During the time period that the competing companies existed (2010 – present), Plaintiff asserts that the Barnhill Defendants, together with Denise Leblanc and Daniel Triche, engaged in a scheme to defraud Global Oil. Specifically, the Plaintiff alleges that the Defendants stole blueprints, tools, and customers from Global Oil. It asserts that as part of their scheme, Defendants engaged in act of wire fraud and mail fraud by sending various misleading emails, disseminating misleading information over the phone, and making shipments via the competing companies to Global Oil's customers. In the complaint, Plaintiff further avers that DSM bought tools from Global Oil at steep discounts and that Global Oil paid for expenses incurred by the competing companies. All of the acts alleged in the complaint are reported to have taken place between May 24, 2010 and February 2012. Plaintiff further asserts that Defendants' activities resulted in financial injury to Global Oil, for which it seeks damages under the above-referenced legal theories.

On August 3, 2012, the Barnhill Defendants and Daniel Triche and Denise Leblanc each filed motions to dismiss (Rec. Docs. 21, 22). Plaintiffs replied to the Defendants' motions on August 24, 2012 (Rec. Doc. 30). Subsequently, the Barnhill Defendants filed a reply thereto (Rec. Doc. 34), asserting in the reply that the

Plaintiffs were barred from bringing an action due to the existence of an arbitration agreement.[1] That arbitration agreement is the subject of the instant motion. Accordingly, on August 31, 2012, the Barnhill Defendants filed the instant motion requesting that the Court stay this matter and compel the Plaintiff to submit its claims to arbitration.

## THE PARTIES' ARGUMENTS

Defendants' motion asserts that there are written agreements between Wilfred Barnhill, Brian Barnhill, and Global Oil which contain binding arbitration clauses that apply to all of the claims Global Oil asserts in its complaint. Specifically, Defendants' motion refers to two August 5, 2005 Executive Employment Agreements ("Employment Agreements" or "Agreements"), executed by Grifco and Wilfred and Brian Barnhill. Each Agreement sets a three-year term of employment for the Barnhills at Global Oil, commencing on August 5, 2005. Each Agreement includes the same binding arbitration clause which states that,

---

[1] It should be noted that the existence of an arbitration agreement was not the subject of, nor was it mentioned in, the Barnhill Defendants' original motion to dismiss. Additionally, it was not mentioned in the Plaintiff's reply. It was mentioned for the first time in the Barnhill Defendants' reply memorandum, and then subsequently with the filing of the instant motion to compel arbitration. The Court also notes that Plaintiff filed a surreply to the motion to dismiss on September 17, 2012.

> Any controversy, claim or dispute arising out of or relating to this Agreement or the employment relationship, either during the Existence [sic] of the employment relationship or afterwards, between The [sic] parties hereto, their assignees, their affiliates, their attorneys or Agents [sic] shall be settled by arbitration in Houston, Texas.

Defense Exhibit A, Rec. Doc. 35-2, p. 10, § 8.06; <u>see also</u>, Defense Exhibit B, Rec. Doc. 35- 3, p. 10, § 8.06.

Defendants argue that all of the claims asserted in the Plaintiff's complaint arise from those initial Employment Agreements and/or the employment relationship between the Barnhills and Global Oil and, thus, must be arbitrated. In making this argument, Defendants assert that Global Oil (a non-signatory) is bound to arbitrate because it was: (1) a contemplated party to the agreements, (2) an affiliate of Grifco, as defined by the Agreements,[2] and/or (3) a party who

---

[2] In their reply brief Defendants specifically argue that Global Oil is an intended party to the arbitration agreement because the Employment Agreement was contemporaneously executed with the Acquisition and Purchase Agreement between Grifco and the shareholders of Global Oil. Specifically, Defendants contend that the Employment Agreements were executed in consideration of the proposed purchase. Defendants assert that because these documents were part of the same

benefitted from the Agreements and, thus, is required by law to participate. Furthermore, Defendants argue that the arbitration clause is still valid and binding upon the parties, despite the fact that the Employment Agreements have expired. In support, Defendants point to the language in the arbitration clause which states that the clause applies to claims "arising out of or relating to this Agreement or the employment relationship, either during the Existence [sic] of the employment relationship *or afterwards*." Defendants' Memorandum, Rec. Doc. 35-1, p. 2 (emphasis added). Defendants contend that the phrase "or afterwards" indicates that the parties intended for the arbitration clause of survive the termination of the Agreements. In addition, Defendants contend that Diane Barnhill, DSM, and Barnhill Industries are the affiliates of the two Barnhills who are signatories on the Agreements and, therefore, are also included within the scope of the arbitration clause. Likewise, they contend that under the theory of equitable estoppel, the allegations against the two Barnhill signatories and the

---

transaction, they must be interpreted together as forming one contract. Defendants assert that a reading of the Acquisition and Purchase Agreement in conjunction with the Employment Agreements demonstrates that it was Grifco and the Barnhills' intention to include Global Oil in the arbitration clause and/or Employment Agreements as a party. Furthermore, Defendants argue that if they are not a party to the contract, they are at least an affiliate to the Employment Agreements. Defendants' Reply, Rec. Doc. 60, 1-3.

nonsignatory Defendants are "substantially interdependent" because they arise from the same operative facts, thereby indicating that they must be heard together in an arbitration proceeding.

In response, Plaintiff argues that the arbitration clauses in the Agreements do not bind Global Oil because: (1) Global Oil was not a party to the Agreements; (2) the Agreements have expired; and (3) the claims asserted in the complaint do not arise out of or relate to the Employment Agreements. First, Plaintiff notes that the Employment Agreements were executed by Grifco and the Barnhills, not Lyamec, the company that currently owns Global Oil, or Global Oil itself. Plaintiff asserts that there are multiple examples throughout the Agreements which indicate that the Agreements and arbitration clauses were only applicable as to Grifco.[3]

Second, Plaintiff asserts that the Agreements set out a three year employment term which expired on August 5, 2008. Plaintiff contends that the behavior referenced in the complaint is alleged to have occurred between 2010 and 2012, after the

---

[3] For example, Plaintiff points to Section 8.08, the Hold Harmless clause of the Agreements, in which it states that the Executive (Wilfred and/or Brian Barnhill) "will instead look solely to the Assets of the Company [Grifco] for satisfaction of any debts arising out Of [sic] this Agreement." Def. Ex. A, Rec. Doc. 35-2, p. 9, § 8.08; see also, Def. Ex. B, Rec. Doc. 35-3, p.9, § 8.08.

expiration of the Employment Agreements. Moreover, Plaintiff argues that the language "during the Existence [sic] of the employment relationship or afterwards" should be construed to apply only to conduct that occurred during the three year term of the Agreement. Plaintiff's Opposition, Rec. Doc. 55, p. 7. Plaintiff contends that because the employment relationship could have terminated before the three-year term ended, the language was included to ensure that the directives in the Agreement would still be in force during the term of the Agreement, even where the employment relationship between the parties might have ended.

Third, Plaintiff argues that it is impossible for the claims in the complaint to arise out of the Agreements, because the complaint does not mention the Agreements. Moreover, Plaintiff contends that the alleged conduct began at least two years after the expiration of the Agreements. Furthermore, Plaintiff asserts that even if the Agreements did apply, the arbitration clause does not reference torts, intentional misconduct, and behavior prohibited by statute as alleged in the complaint. Plaintiff argues that the arbitration clause is limited to breaches of the contractual obligations. Plaintiff contends that even without the Employment Agreements its claims would remain intact and, therefore, cannot be said to arise from the Agreements.

Lastly, Plaintiff argues that the only two signatories to the Agreements are Wilfred and Brian Barnhill. Plaintiff asserts that neither it nor the other Defendants were a party to the Agreements and, thus, they are not bound by them. In making this argument, Plaintiff notes that in many cases in which nonsignatories have been sent to arbitration, it was actually the nonsignatory who was seeking to compel the signatory to arbitrate. In particular, Plaintiff argues that the equitable estoppel rules "'appl[y] only to prevent a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" P's Opp., Rec. Doc. 55, p. 12 (quoting <u>Bridas S.A.P.I.C. v. Gov't of Turkmenistan</u>, 345 F.3d 347, 361 (5th Cir. 2003) (citation omitted)).

## DISCUSSION

### A. Federal Framework

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, provides that when parties engaged in commerce enter into contracts containing arbitration clauses, those clauses shall be deemed valid and enforceable by the courts. 9 U.S.C. §§ 2, 3. When evaluating a motion to compel arbitration under the Act, courts

conduct a two-step inquiry to determine first, "whether the parties agreed to arbitrate the dispute in question," and, second, "'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.'" <u>Webb v. Investacorp, Inc.</u>, 89 F.3d 252, 257 (5th Cir. 1996) (quoting <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 628 (1985)). In making the first determination, courts consider (1) whether a valid arbitration agreement exists between the parties, and (2) whether the dispute in question falls within the scope of that agreement. <u>Id.</u> (citing <u>Daisy Mfg. Co. v. NCR Corp.</u>, 29 F.3d 389, 392 (8th Cir. 1994)). When deciding whether parties agreed to arbitrate, courts "should apply ordinary state-law principles that govern the formation of contracts." <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995). Although ambiguities are generally resolved in favor of arbitration, "this policy may only be used to tip the balance . . . when determining the scope of the arbitration agreement—not when determining whether an arbitration agreement exists." <u>BMA Fin. Servs., Inc. v. Guin</u>, 164 F. Supp. 2d 813, 818 (W.D. La. 2001) (citing <u>Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford, Jr. Univ.</u>, 489 U.S. 468, 475-76 (1989)).

**B. State Law**

Under Louisiana law, when a court interprets a contract it makes a determination as to the intent of the parties thereto. LA. CIV. CODE art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." Id. art. 2046. However, where words are ambiguous, they "must be given their generally prevailing meaning." Id. art. 2047. Where they are "susceptible to different meanings [they] must be interpreted as having the meaning that best conforms to the object of the contract." Id. art. 2048. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." Id. at 2050.

**C. Analysis**

The Court begins its analysis by determining whether a valid arbitration agreement exists between Global Oil and the Barnhills. As previously noted, the Employment Agreements at issue were executed between Grifco and Wilfred and Brian Barnhill. The plain language of the Agreements reads, "By this employment Agreement ("Agreement"), Grifco International, Inc., (the "Company") employs W.J. Barnhill [and Brian Barnhill]

("Executive"), who accepts employment on the following terms and conditions[.]" Def. Ex. A, Rec. Doc. 35-2, p. 2; <u>see also</u> Def. Ex. B, Rec. Doc. 35-3, p. 2. The Agreements are signed by Jim Dial, on behalf of Grifco, and Wilfred and Brian Barnhill on their own behalf. Def. Ex. A., Rec. Doc. 35-2, p. 11; <u>see also</u> Def. Ex. B, Rec. Doc. 35-3, p. 11. There is no other definition of "parties" in the Agreements. Thus, the Court finds that per the plain language of the Employment Agreements, Global Oil is not a party.

Defendants argue that despite the language of the Employment Agreements, Global Oil is a party because the Agreements were executed on the same day as the Acquisition and Purchase Agreement between Grifco and the Global Oil shareholders. Defendants cite to Louisiana law which states that contemporaneously executed documents should be construed together when seeking to determine the parties' intent. <u>See, e.g.</u>, <u>Li Rocchi v. Keen</u>, 134 So. 2d 893, 898 (La. 1961). The Court finds that Defendants' argument on this point is misplaced. While the Court may look to contemporaneously executed documents to determine the parties' intent in the event of ambiguity, the

language in the Employment Agreements at issue is not ambiguous.[4]
Not only does the language clearly state that Grifco and the
Barnhills are the parties to the contracts, but section 8.02 of
the Agreements also states that "[t]his Agreement contains the
entire understanding of The [sic] parties and all of the
covenants and agreements between the Parties with respect to such
employment."[5] Therefore, the Court finds that it was not the
intent of the signatories to include Global Oil as a party to the
Agreements. Moreover, even if the Court were to look to the
Acquisition and Purchase Agreement, that contract specifically
states that the Barnhills and Grifco, not the shareholders of
Global Oil or Global Oil itself, were to execute the Employment

---

[4] See Rick Norman, Louisiana Employment Law, in LOUISIANA PRACTICE SERIES § 3:6 (2011 - 2012 ed.) (citing Gebreyesus v. F.C. Schaffer & Assocs., Inc., 204 F.3d 639 (5th Cir. 2000) (holding that under Louisiana law, there is no need to look to extrinsic materials where the contract terms are unambiguous)).The Court also notes that all of the examples of this principle of contract interpretation cited by the Barnhill Defendants are applied in the context of promissory notes and mortgages, not employment contracts. Furthermore, in each of the cited cases, an ambiguity in the execution of one of the instruments, or an error in the execution of one of the instruments, resulted in the need for the court to look at both documents. See, e.g., Mills' Succession v. Manasseh, 147 So. 77 (La. 4 Ct. App. 1933) (looking at both the promissory note and the mortgage to determine if a purchaser assumed liability on the mortgage where the deed was unavailable and the mortgage contained inconsistent terms).

[5] Def. Ex. A, Rec. Doc. 35-2, p. 9, § 8.02; see also, Def. Ex. B, Rec. Doc. 35-3, p.9, § 8.02. This same section also states that "[t]his Agreement supersedes any and all prior agreements and Understandings [sic], either oral or in writing, between the parties to this Agreement with respect to the employment of the Executive by the Company." Id.

Agreements as part of their closing obligations.[6] Thus, the language in the Acquisition and Purchase Agreement only reinforces the Court's finding.

As such, the Court now looks to the Defendants' argument that Global Oil is bound by the Employment Agreements because it directly benefitted from them. The Fifth Circuit has found that "[a]rbitration agreements apply to nonsignatories only in rare circumstances." Bridas, 345 F.3d at 358. Nevertheless, there are times when "[o]rdinary principles of contract and agency law may be called upon to bind a nonsignatory to an agreement." Hellenic Inv. Fund, Inc. v. Det Norske Veritas, 464 F.3d 514, 517 (5th Cir. 2006). One theory that the court has recognized for binding a nonsignatory to an arbitration agreement is the doctrine of direct benefits estoppel. Id. "Direct benefits estoppel applies when a nonsignatory to the agreement 'knowingly exploits the agreement containing the arbitration clause.'" Bridas, 345 F.3d at 362 (quoting E.I. DuPont de Nemours & Co. v. Rhone Poulenc, 269 F.3d 187, 199 (3rd. Cir. 2001)). In order for direct benefits estoppel to apply, the third-party must directly benefit from the agreement, and it must also bring "suit against a signatory

---

[6] "1.4. Closing Obligations. At the Closing, *the parties have presented* . . . (iii) Employment agreement in the form of Exhibit 1.4(a)(iv), executed by W.J. Barnhill and Brian Barnhill. . . . (iii) The Employment Agreements executed by Grifco." Defendants' Reply Exhibit 1, Rec. Doc. 60, p. 4.

premised in part upon the agreement." <u>Bridas</u>, 345 F.3d at 362.

Defendants rely primarily on the Fifth Circuit's decision in <u>Hellenic Investment Fund, Inc. v. Det Norske Veritas</u>. In <u>Hellenic</u>, Det Norske Veritas ("DNV"), a classification society, contracted with Inlet, a ship owning consortium, to provide class-related inspections and classifications of Inlet's ship, the M/V MARIANNA. 464 F.3d. at 515-16. As a classification society, DNV operated under an established set of Rules, which contained a mandatory forum selection clause that required all disputes to be resolved by courts in Oslo, Norway. <u>Id.</u> at 516-17. Subsequently, Hellenic, a ship owning consortium, bought the M/V MARIANNA from Inlet. <u>Id.</u> at 515-16. The sale contract between Inlet and Hellenic designated that DNV would continue to act as the classification society for the ship. <u>Id.</u> However, before Hellenic would finalize the sale, it required that all class inspections be completed on the M/V MARIANNA. <u>Id.</u> After DNV (under contract with Inlet, not Hellenic) completed the necessary inspections, Hellenic finalized the purchase. <u>Id.</u> Thereafter, Hellenic discovered defects in the ship that prevented it from making at least two voyages. <u>Id.</u> Hellenic claimed that DNV's pre-purchase inspection should have revealed the defects, and it sued DNV on the grounds of negligent misrepresentation. <u>Id.</u> at 516-17.

Upon being sued, DNV sought to enforce the forum selection clause contained in its Rules. Id. Hellenic claimed that at the time the inspections were conducted, it had no contract with DNV and, therefore, was not bound by the forum selection clause. Id. The court, applying the theory of direct-benefits estoppel, found that Hellenic was bound because it had benefitted from DNV's contract with Inlet, DNV's inspection, and, thus, DNV's Rules. Id. at 518-19. In particular, the court noted that all of Hellenic's claims were premised upon DNV's failure to follow its own Rules, the same Rules that contained the forum selection clause. Id. at 518-20. Therefore, the court found that Hellenic was estopped from claiming that it was not bound by the arbitration clause. Id. at 520.

The Court finds that the instant case is distinguishable. In Hellenic, the plaintiff's claims were premised on the Rules that contained the forum selection clause. In contrast, the claims raised in the instant complaint are not premised upon the Employment Agreements. In particular, the complaint does not reference the Employment Agreements, does not assert contractual claims and/or breach of contract claims, and all of the Plaintiff's claims whether under tort, statue, or state law governing business entities stand on their own regardless of the

existence of the Agreements.[7] In <u>Hellenic</u>, without DNV's Rules, the plaintiff had no claim against DNV. Here, the Plaintiff has claims against the Defendants regardless of the Employment Agreements. Moreover, the complaint in this case is premised upon incidents that occurred between 2010 and 2012. The Employment Agreements themselves provide a clear three-year term of effectiveness which ended in August 2008.[8] Thus, nothing alleged in the complaint could possibly arise from the Agreements, because the Agreements had expired by the time that the conduct in question occurred.[9]

---

[7] The Court notes that it is not finding that the claims in the complaint must be contractual, or of a contractual nature, in order to arise out of the Agreements. Indeed, the claims in <u>Hellenic</u> were for negligent misrepresentation, not breach of contract. Rather, the Court is simply distinguishing between claims that require the existence of the Employment Agreements, or are premised upon them, and claims that do not require its existence.

[8]
> By this Agreement, the Company [Grifco] employs the Executive [Wilfred and Brian Barnhill], and the Executive accepts employment with the Company, beginning on the 5 day of Aug, 2005. This Agreement shall be effective upon execution and shall remain in effect for a period of 3 years from the effective date hereof until terminated by either party in accordance with the termination provisions set forth below.

Def. Ex. A, Rec. Doc. 35-2, p. 2, § 1.01; <u>see also</u>, Def. Ex. B, Rec. Doc. 35-3, p. 2, § 1.01; <u>infra</u>, note 10.

[9] The Court notes that Defendants have argued that the arbitration clause survives the Employment Agreements. In making their argument, Defendants rely on <u>Municipal Energy Agency of Mississippi v. Big Rivers Electric Corp.</u>, 804 F.2d 338 (5th Cir. 1986), a case in which the Fifth Circuit held that where the express language of the contract provides that an arbitration agreement shall survive the termination of the contract, such language should control over more general provisions. <u>Id.</u> at 343. In <u>Big Rivers</u>, the language referenced by the court specifically stated that, "[t]his provision shall survive the termination of this agreement." <u>Id.</u> at 340. Thus, it is distinguishable from the words "or

Furthermore, in response to Defendants' argument that Global Oil is estopped because its claims arise out of the employment relationship between the Barnhills and Global Oil, the Court looks to the language of the Employment Agreements.[10] In section 3.02 of the Agreements the parties define the nature of their employment relationship as follows:

The relationship between the Company [Grifco] and the Executive [Wilfred and/or Brian Barnhill] at all times during the term of this agreement shall be that of an exclusive employee. While Employed under this Agreement, the Executive [Wilfred and Brian Barnhill] shall at all times devote his Full [sic] time,

afterwards," which are referenced by the Defendants as requiring that the arbitration clause survive. Moreover, reading the Employment Agreement as a whole, the Court notes that in section 6:01, Confidential Information and Invention Assignments, the parties expressly state that "[t]he obligation under [this section] shall survive the termination of this Agreement for any reason." Def. Ex. A, Rec. Doc. 35-2, p. 5, § 6:0; see also, Def. Ex. B., Rec. Doc. 35-3, p. 5,§ 6:0. This leads the Court to believe that if the parties to the Employment Agreement had desired to have the arbitration clause survive the Agreements, they certainly could have done so as they made express provisions to do just that in another section of the Agreement. Accordingly, the Court is not persuaded by Defendants' arguments.

[10] Defendants specifically argue that as long as Plaintiff brings a claim related to the Barnhills' employment at Global Oil, it is covered by the arbitration clause because the arbitration clause states that it is applicable to "[a]ny controversy, claim or dispute arising out of or relating to this Agreement or the *employment relationship*, . . ." Def. Reply, Rec. Doc. 60, pp.5-6.

attention, and best efforts on behalf of the Company [Grifco], and shall Perform [sic] all services, acts and duties connected with his position in such a Manner [sic] as the Company [Grifco] from time to time may direct. The Executive [Wilfred and/or Brian Barnhill] shall, For [sic] all purposes of this Agreement, be deemed to be an employee of the Company [Grifco] or that subsidiary or affiliate to which he is assigned, and all Payments [sic] and distributions hereunder shall be reported for tax purpose in The [sic] same manner as compensation paid to other employees.

Def. Ex. A, Rec. Doc. 35-2, p. 3, § 3.02; <u>see also</u>, Def. Ex. B, Rec. Doc. 35-3, p. 3, § 3.02

The employment relationship as defined by the Employment Agreements always includes two entities/individuals: Grifco and Wilfred Barnhill and/or Grifco and Brian Barnhill. Sometimes, the employment relationship may include a subsidiary or affiliate, i.e. Global Oil.[11] However, at all times, Grifco remains a part

---

[11] Section 3.0, Scope of Duties, explains that Grifco employs the Barnhills to serve in executive positions at Global Oil for a term of three years. Def. Ex. A, Rec. Doc. 35-2, pp.2-3, § 3.01; <u>see also</u>, Def. Ex. B, Rec. Doc. 35-3, pp.2-3, § 3.01. Thus, it is evident that Global Oil is the subsidiary referred to in

of that relationship. Thus, the employment relationship referred to in the arbitration clause would necessarily include Grifco, not just the Barnhills and Global Oil. As such, because none of the claims alleged by the Plaintiff arise out of the employment relationship between Grifco, the Barnhills, and Global Oil, unlike the plaintiff in <u>Hellenic</u>, Global Oil is not bound to arbitrate under the clause.

Because the Court has determined that the Plaintiff is neither a party to nor a beneficiary of the Agreements, it ends its inquiry here. However, the Court notes that even if Global Oil could be found to be a party to or to be bound by the Employment Agreements, the preceding analysis also indicates that the Plaintiff's claims would not fall within the scope of the arbitration clause. Therefore, Defendants' arguments on that point would fail as well. In particular, the Court notes that the scope of the arbitration clause requires that the claims be related to the employment agreement and/or the employment relationship between Grifco, the Barnhills, and Global Oil. Because the claims alleged in the complaint reference a time period after the termination of the Agreements and do not involve Grifco, they would not fall within the scope of the arbitration

section 3.02, Nature of Relationship.

clause. Thus, the parties did not agree to arbitrate the dispute in question. Accordingly,

**IT IS ORDERED** that Defendants' motion is **DENIED.**

New Orleans, Louisiana this 16th day of October, 2012.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE