UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GLOBAL OIL TOOLS, INC.                                    CIVIL ACTION

VERSUS                                                          NO: 12-1507

WILFRED J BARNHILL, ET AL.                          SECTION: "J" (4)

ORDER

Before the Court is Defendants, Wilfred J. Barnhill, Brian A. Barnhill, Diane Barnhill, and Barnhill Industries, Inc.'s, (collectively, the "Barnhills") **Defendants' Motion to Compel Production of Documents Listed in Global Oil Tools' Privilege Log (R. Doc. 140)**, seeking an Order from the Court compelling Plaintiff, Global Oil Tools, Inc., ("Global Oil") to produce certain documents listed on its privilege log. The motion is opposed (R. Doc. 142), and the Barnhills have filed a Reply (R. Doc. 148). After the hearing both Global Oil and the Barnhills were invited to submit additional briefing into Court, which Global Oil did (R. Doc. 151), followed by the Barnhills (R. Doc. 157). The motion was heard by oral argument on March 13, 2013.

I.    **Background**[1]

      A.    **Global Oil's Allegations**

      Global Oil alleges that it manufactures wireline tools and downhole flow control systems for the oil and gas industry. *Id.* at 4. In 2007 Global Oil was sold to a third party, Lyamec. *Id.* at 4.

      ———————————————

      [1]Nos. 12-1507J and 12-3041J were consolidated on January 4, 2013, with 12-1507J being the "master docket." (R. Doc. 120).

Wilfred, then the President of Global Oil, allegedly put in a request for additional administrative staff, and hired his wife, Diane, for the role.  *Id* at 5.  He then allegedly hired his son, Brian, to be Global Oil's Vice President, Financial Officer, and Treasurer, at which point Brian became responsible for all financial reporting, payroll, purchasing, tracking physical inventory, signing checks, signing of corporate tax returns, hiring, and marketing.  *Id.*  Allegedly, no job description for Diane was ever provided.  *Id.*

According to the Complaint, after several years of declining profits, Wilfred and Diane resigned on January 11, 2012, and Brian resigned on February 22, 2012.  *Id.* at 6-7.  Around this time, other Global Oil employees allegedly began to inform the new management about widespread corrupt and fraudulent behavior of the defendants.  *Id.* at 6.  This behavior allegedly included (1) unlawful discounts to entities owned by Wilfred, (2) stolen business opportunities and customers, (3) use of Global Oil's funds to pay competing businesses' expenses, and (4) theft of Global Oil's labor, inventory, tools, and intellectual property.  *See id.* at pp. 7-22.  As alleged in the Complaint, the defendants allegedly attempted to cover up their misdeeds by destroying files and scrubbing computers.

The instrument of these misdeeds were allegedly the Barnhills' own corporate entities. Specifically, on May 24, 2010, Wilfred and Diane allegedly directed Barnhill Industries, Inc. to register the trade name "Global International Tools" with the Louisiana Secretary of State, identifying the company's field as "retail - oil field products."  *Id.* at 7.  GIT's office was located near Global Oil's business office, and Global Oil alleges that "[t]rucks often arrived at Global Oil . . . with deliveries for [GIT] and were directed" by either Wilfred or Brian to the GIT office.  *Id.*

at 8-9.[2]

Further, in January 2011, Wilfred and Brian "started" defendant Downhole Surface Manufacturing ("DSM"). *Id.* at 9. DSM's operating location was also occupied by GIT. *Id.* Brian and Barnhill are DSM's officers. Under the direction of Wilfred and Brian,[3] Global Oil was directed to sell products to DSM at discounted prices. *Id.* at 10. Brian's Visa credit card was "used to make purchases for . . . DSM while he was employed by Global;" the Complaint then goes on to illustrate several examples of purchases made on behalf of DSM. *See id.* at 13-18. Based on this conduct, Global Oil alleges that "it is believe [the defendants'] fraud extends back to 2008." *Id.* at 18.

Global Oil has brought suit under The Racketeer Influence and Corrupt Organizations Act (18 U.S.C. § 1962) ("RICO"), the Lanham Act, 15 U.S.C. § 1125 ("Lanham Act"), as well as Louisiana state law. (R. Doc. 116, p. 1).[4]

### B.    The Barnhills' Counterclaim

In its Answer to Global Oil's Amended Complaint, the Barnhills included a counterclaim which alleges that the "prehistory" of Global Oil's Complaint is more complicated than the brief gloss it receives therein. Specifically, the Barnhills allege that Wilfred owned and operated Global Oil for over twenty-five years between 1979 and 2005, building it into a successful family business. (R. Doc. 124, p. 20). The Barnhills then allege that Wilfred then sold Global Oil to another company, Grifco, for $4.5 million. *Id.* Wilfred's sale of Global Oil to Grifco was originally contemplated a cash transfer of the $4.5 million. *Id.* Grifco's CEO, David Dial, ("Dial") was

---

[2]The Barnhills subsequently agreed to cease using the trade name "Global International Tools" pursuant to a Consent Judgment entered by the presiding U.S. District Judge. *See* (R. Doc. 84).

[3]Global Oil also alleges that another defendant, Denise LeBlanc, was also involved in this transfer. (R. Doc. 116, p. 10).

[4]Global Oil duly amended its Complaint on December 10, 2012. (R. Doc. 116).

installed as President and Director of Global Oil.  *Id.*

The Barnhills allege that thereafter, another company, Lyamec, acquired a "significant interest" in Grifco.  *Id.* at 21.  The Barnhills further allege that Grifco subsequently renegotiated Wilfred's purchase contract of Global Oil to include $2.2 million in case, plus 3.7 million shares of Grifco stock.  (R. Doc. 124, p. 21).[5]  The Barnhills then allege that the Grifco stock was, after "various misrepresentations," exchanged for stock in another company controlled by Lyamec, Global Oil Tools Libya ("Global Libya").  *Id.* at 21.  Allegedly, the Global Libya stock was eventually found to be worthless, and even here requests to redeem the stock have gone unheeded.  *Id.* at 21, 26.

The Barnhills allege that around the same time, Grifco and its owner, David Dial, ("Dial") became subject to a federal criminal investigation which alleged that "Dial and his co-conspirators defrauded investors . . . [by] artificially inflat[ing] the stock prices of Grifco through issuance of false press releases."  (R. Doc. 124, p. 22).  The Barnhills allege that "Dial was sentenced to five years in prison after pleading guilty and admitting to the scheme."  *Id.* at 23.  The Barnihills have also alleged that "[t]he SEC has also recently filed a separate actions against Dial and his co-conspirators for violations of the Securities Act and the Exchange Act which remains pending." in the U.S. District Court for the Southern District of Texas.  *Id.* at 23.

The Barnhills further allege that several months after the criminal investigation against Dial commenced, on July 10, 2007, Dial resigned his position as President and Director of Global Oil.  *Id.*  Lyamec's owner/controller, Riad Ghariani, ("Ghariani") became Director, President, and CEO

---

[5]Although Global Oil's original Complaint explicitly stated that Wilfred had sold Global Oil to Grifco in 2005, its Amended Complaint states only that "[i]n 2007, Lyamec . . . acquired ownership of Global Oil Tools."  (R. Doc. 116, p. 5).

of Global Oil, after which the company's financial health began a drastic decline. *Id.* According to the Barnhills, Ghariani required Global to obtain loans from his own financing company at "unreasonably high interest rates," including financing to pay Ghariani's own salary. *Id.* Ghariani also allegedly "deplete[d] Global's cash reserves by making large cash purchases, such as truck, and vans . . . .  Many of these cash purchases were unrelated to Global's business." *Id.* at 25.  Ghariani also allegedly "diverted over $300,000.00 of Global funds to a separate bank account that was under his control." *Id.*  The Barnhills contend that as a result of these and other actions, Ghariani depleted Global's cash reserves. *Id.*

The Barnhills have brought claims for fraud, alleging that Dial obtained control of Global Oil from Wilfred without paying full consideration. *Id.* at 26.  The Barnhills also re-alleged their state-law claims against Global Oil for, *inter alia*, breach of contract, return of Global Oil stock, and unpaid wages and vacation pay. *See* (No. 12-3041, R. Doc. 1-1).

### C.     The Instant Motion

The instant motion arises in connection with Global Oil's initial investigation of tools which allegedly disappeared from Global Oil's premises.  Global Oil hired a forensic accounting firm, McGovern & Green, ("McGovern") to generate an accounting report of the transactions which purportedly substantiated Global Oil's suspicions ("McGovern Report").  Global Oil also retained the services of a private investigator, Jack Schumaker, ("Schumaker") who eventually began communicating with Lieutenant Donald Tomlin of the Terrebonne Parish Sheriff's Office ("Tomlin") after Global Oil's current president, Paul McCarley, ("McCarley") swore out a criminal complaint against Wilfred in connection with the allegedly stolen tools.

The Barnhills argue that they subsequently issued Request for Production of Documents

upon Global Oil, to which Global Oil issued a privilege log.  (R. Doc. 140-1, p. 3).[6]  This log lists

the McGovern Report as "attorney work-product."  *Id.*[7]  They filed the instant motion, seeking to

compel production of the McGovern Report.  Global Oil opposes the motion, and the Barnhills have

filed a Reply.  The parties then submitted additional briefing to the Court after the hearing date.

## II.    Standard of Review

Federal Rule of Civil Procedure ("Rule") 26(b)(1) provides that "[p]arties may obtain

discovery regarding any non-privileged matter that is relevant to any party's claim or defense." Rule

26(b)(1).  The Rule specifies that "[r]elevant information need not be admissible at the trial if the

discovery appears reasonably calculated to lead to the discovery of admissible evidence."  *Id.*  The

discovery rules are accorded a broad and liberal treatment to achieve their purpose of adequately

informing litigants in civil trials.  *Herbert v. Lando*, 441 U.S. 153, 177 (1979).  Nevertheless,

discovery does have "ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders*, 437

U.S. 340, 351 (1978) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)).  Further, it is well

---

[6]The Barnhills have failed to attach their discovery requests to the instant motion.  However, they include in their motion a copy of Global's privilege log.  Moreover, Global Oil has failed to contest that the Barnhills' failure to include the production requests is procedurally deficient.  Further, Global Oil does not contend that the documents sought, whether privileged or not, are not relevant to the Barnhills' discovery requests.  Finally, the instant dispute pertains to the applicability of work-product privilege, not the relevance of the discovery sought.  For these reasons, the Court finds that the Barnhills' failure to attach its discovery requests to the instant motion does not warrant dismissal under L.R. 7.4.

[7]In addition to the McGovern Report, the Barnhills initially requested a list of eleven emails between Schumaker and Tomlin, which were subsequently forwarded on to Global Oil's attorney, Joe Bailey ("Bailey").  *Id.*  Global Oil had asserted both the work product doctrine and the attorney client privilege over several emails between Schumaker and Tomlin, which "appear to relate to a criminal complain sworn out against Wilfred . . . [by] McCarley."  *Id.*  The Barnhills argued that they previously requested these documents from Global Oil, and only after doing so filed the instant motion. *Id.*  The Barnhills also argued that these communications are not privileged because although they were at one time sent to Bailey, they were not *initially* sent to him; moreover, they were not work-product, because Tomlin is not a Global Oil representative, but a local police officer who was apparently investigating the criminal complaint sworn out by McCarley. (R. Doc. 140-1, p. 8).  As such, the emails were not generated either in the course of seeking legal assistance, or in anticipation of the civil suit which Global Oil eventually filed against the Barnhills. *Id.* at 9.  In opposition, Global Oil contended that the Barnhills failed to demonstrate a "substantial need" for these emails, as they could obtain them from Tomlin himself. (R. Doc. 142, p. 9).  The Barnhills' Reply indicated that its motion is now moot as to these emails, because the Barnhills issued a subpoena upon Tomlin and received the requested discovery.  (R. Doc. 146-1, p. 2).

established that "control of discovery is committed to the sound discretion of the trial court . . . ." *Freeman v. United States*, 556 F.3d 326, 341 (5th Cir. 2009); *Coleman v. Am. Red Cross*, 23 F.3d 1091, 1096 (6th Cir.1994).

Under Rule 26(b)(2)(c), discovery may be limited if: (1) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from another, more convenient, less burdensome, or less expensive source; (2) the party seeking discovery has had ample opportunity to obtain the discovery sought; or (3) the burden or expense of the proposed discovery outweighs its likely benefit. *Id.* In assessing whether the burden of the discovery outweighs its benefit, a court must consider: (1) the needs of the case; (2) the amount in controversy; (3) the parties' resources; (4) the importance of the issues at stake in the litigation; and (5) the importance of the proposed discovery in resolving the issues. *Id.* at 26(b)(2)(C)(iii).

Rule 26(b)(3) provides that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party in its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." *Id.* However, such materials may be discoverable when either allowed by Rule 26(b)(1), or when a party shows a "substantial need" for the information and that obtaining the information by another means would pose an "undue hardship." *Id.*

### III.   Analysis

####    A.   Ghariani and Fielding Declarations

In support of their position that the McGovern Report was commissioned in "anticipation of litigation," Global Oil originally attached the Declaration of Susan Fielding, Corporate Secretary of Global Oil ("Fielding Declaration"). However, at oral argument the Court found that the Fielding

Declaration contained merely conclusory statements, which were insufficient for Global Oil to meet its burden to show that the work-product doctrine applied.[8]  *See, e.g.*, *United States v. Roxworthy*, 457 F.3d 590, 597 (6th Cir. 2006); *In re grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 385 (2d Cir. 2003).  However, Global Oil was given the opportunity to supplement its opposition with a more specified Declaration.  Subsequently, Global Oil filed into the record the Declaration of Riad "Raymond" Ghariani, Global Oil's Director (R. Doc. 151-1) ("Ghariani Declaration").

Gharini indicates that at some undisclosed time in the past, he began to receive discrepancies between Global Oil's "weekly reports, costs, and the number of new jobs being opened compared to the amount of overtime which was being paid." (R. Doc. 151-1, p. 1).  This led Global Oil to decide "that an investigation was necessary" and that the company "should start searching for a third party to investigate." *Id.*  Ghariani made an on-site visit during February 2012, in which he, McCarley, and Fielding took statements from longstanding Global Oil employees.  *Id.* at 2.  The statements indicated that the Barnhills had created Global International Tools, and were diverting

---

[8]The Fielding Declaration states that the McGovern Report was "commissioned so Global . . . would have a third-party investigation of the Barnhills' conduct and the financial effect thereof." (R. Doc. 142-1, p. 1).  Further, Fielding states that the McGovern's investigation was "conducted for the ultimate purpose of litigation and . . . [was] created for litigation purposes." *Id.* at 2.  In their Reply, the Barnhills challenge the statements in the Fielding Declaration as "conclusory." (R. Doc. 148, p. 2).  The Fielding Declaration states that Schumaker was hired "to investigate the Barnhills and their conduct, which is at issue in this litigation, particularly with respect to the Barnhills' theft of Global Oil Tools' tools and prints." (R. Doc. 142-1, p. 1).  Fielding further states that McGovern was hired "to investigate the Barnhills[] and their conduct, which is at issue in this litigation." *Id.*  Fielding then states that both Schumaker's investigation, as well as the McGovern Report, "were conducted for the ultimate purpose of litigation." *Id.* at 2.  These statements are not only conclusory, but also paradoxical - as Fielding first states that Schumaker was hired "particularly" in connection with the Barnhills' alleged theft of Global Oil's prints, and then states that the *ultimate purpose* of retaining Schumaker was to engage in litigation.  *Id.* at 1-2.  Moreover, it is not clear *who* at Global Oil actual commissioned the McGovern Report, even though Fielding declares that Schumaker was hired by McCarley, Global Oil's president.  *See id.* at 1-2.  Instead, regarding the role of counsel, Fielding states only that "Joe Baily was an attorney hired by [Global Oil] . . . to provide legal advice with respect to the investigations." *Id.* at 2.  Fielding does not indicate *how* Bailey was involved.  Indeed, at oral argument Global Oil's counsel represented that although he did not know *who* at Global Oil commissioned the McGovern Report, it would have been one of three Global Oil corporate officers, none of whom is an attorney.  The Court found that the Fielding Declaration did not sufficiently demonstrate that the McGovern Report was commissioned and completed in anticipation of litigation.

business to that company.  *Id.*  Global Oil then contacted Joe Bailey, a Texas-based attorney, who

advised Global Oil to contact a third party to investigate the employees' allegations.  *Id.*  Ghariani

stated that he ordered Fielding and McCarley to retain a third party investigator, who was to report

findings to both Bailey and himself.  *Id.*  McGovern *"had already been contacted"* at that time.  *Id.*

(emphasis added).  McGovern's investigation began on February 22, 2012, and continued, to the

best of Ghariani's belief, until March 9, 2012.  *Id.*  During McGovern's investigation, Bailey

"instructed" McGovern to produce its investigation in written form, and that "the document needed

to be protected by the attorney-client and work-product privileges."  *Id.*  Ghariani also states that

Schumaker was retained on Bailey's advice, although he does not specify when this occurred.  *Id.*

On March 7, 2012, the Barnhills' attorney sent three demand letters to Bailey in connection

with compensation allegedly owed to Wilfred, Diane, and Brian.  *Id.* at 2, 7-12.  Bailey informed

the Barnhills' attorney that he was "aware of the Barnhills' fraud and would continue to investigate."

*Id.* at 2.

Ghariani states that "throughout this process, I considered litigation against the Barnhills to

be inevitable," and that Global Oil "certainly intended that the [McGovern Report] would be used

. . . in litigation."  *Id.*  According to Ghariani, the primary purpose for the composition of the

McGovern Report was to aid in possible future litigation.  *Id.* at 2-3.  Gharini also states that after

he received McGovern's "communications, findings, and report," he met with Bailey, and decided

to file the instant suit.  *Id.* at 3.

### B.      Circumstances Giving Rise to McGovern Report

#### 1.      Whether the Document is Work Product

In support of their motion, the Barnhills argue that the documents sought were not prepared

in anticipation of litigation, but were instead an "in house" accounting.  (R. Doc. 140-1, p. 6).

Global Oil argues that there is no indication that the "primary motivating purpose" of the document

was legal assistance.  *Id.*  Tellingly, the Barnhills argue that the McGovern Report was "ordered"

while Brian Barnhill was still employed at Global Oil.  *Id.*[9]  Moreover, even if this purpose was legal

assistance, the work-product doctrine does not extend to the facts underlying the privileged

communication.  *Id.* at 7.  The Barnhills also argue that even if the document is work-product, it is

discoverable because Global Oil's Complaint premises some of its legal claims on the fruits of this

investigation; "[i]t will be difficult, if not impossible, for the Barnhills to defend . . . against Global's

allegations, without being able to examine the report that is the basis for their claims."  *Id.*

In opposition, Global Oil argues that the McGovern Report falls under the work product

doctrine because it was compiled by an independent third party, and did not arise in the ordinary

course of Global Oil's business.  (R. Doc. 142, p. 6).  Global Oil also argues that it was prepared in

anticipation of litigation because even if Brian Barnhill was still employed at the time the McGovern

Report was "ordered," Brian had left the company by the time McGovern actually began working

on the report, and the report was only *finalized* after Brian had left the company.  *Id.* at 7.

In their Reply, the Barnhills further argue that according to other discovery obtained from

Tomlin in connection with Schumaker's investigation, the primary purpose of the McGovern Report

was to substantiate McCarley's criminal complaint against Wilfred.  (R. Doc. 148-1, pp. 3-4; 148-2,

pp. 26-44).  The Barnhills argue that it was only after the Terreborne Parish Sheriff's Office

indicated that it would not bring charges against Wilfred that Global Oil sued the Barnhills.  (R.

Doc. 148-1, p. 4).  Tomlin's narrative of the investigation concludes, after interviewing various

---

[9]The Barnhills do not elaborate on the specific meaning of the word "ordered" in this Motion.

witnesses including the Barnhills, that the circumstances "seemed to be a civil matter and no criminal actions would be taken" by the Sheriff's Office.  (R. Doc. 148-2, p. 17).[10]  Indeed, the emails indicate that Schumaker states, "we *may* pursue this matter in civil court."  (R. Doc. 148-2, p. 39) (emphasis added).  Therefore, the Barnhills argue that the document was not prepared in "anticipation" of litigation.

The work-product doctrine protects materials prepared by or for in attorney in preparation for litigation.  *Hickman v. Taylor*, 329 U.S. 495 (1947).  "The law of [the Fifth C]ircuit is that privilege can apply where litigation is not imminent."  *In re Kaiser Aluminum and Chemical Co.*, 214 F.3d 586, 593 (5th Cir. 2000); *Crosby v. Blue Cross Blue Shield of Louisiana*, No. 08-693, 2012 WL 5450040, at *7 (E.D. La. Nov. 7, 2012) (Roby, M.J.) (applying *Kaiser* to letter written by attorney to client regarding interpretation of client's medical policy, which contained language such as "we can argue").  Specifically, it may be also be asserted "as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation."  *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982).  "The work product doctrine does not exist to protect a confidential relationship but to promote the adversary system by 'safeguarding the fruits of an *attorney*'s trial preparations from the discovery attempts of an opponent.'"  *Blockbuster Entertainment Corp. v. McComb Video, Inc.*, 145 F.R.D. 402, 404 (M.D. La. 1992) (quoting *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989) (emphasis added).  Moreover, the work product doctrine extends only to documents and tangible things produced "by or for" an attorney preparing for litigation; the protection does not extend to the "underlying relevant facts."

---

[10]Tomlin's Report also states that, "since there was never an inventory of tools and other items at Global Oil . . . there was no way that [the Sheriff's Office] could dispute [Wilfred] Barnhill's word that the items he took belonged to him."  (R. Doc. 146-2, p. 18).

*Blockbuster*, 145 F.R.D. at 403-04 (M.D. La. 1992). The burden of asserting work product rests with the party who seeks to assert it. *Hodges, Grant & Kaufman v. U.S. Government, Dep't of the Treasury, I.R.S.*, 768 F.2d 719, 721 (5th Cir. 1985).

"The test for work-product protection is whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared of obtained because of the *prospect* of litigation." *Kansas City Southern Railway v. Nichols Construction Co., L.L.C.*, Nos. 05-1182, 05-220, 05-4653, 2007 WL 1792352, at *2 (E.D. La. June 20, 2007) (internal quotation marks omitted). Courts have looked to factors including whether (1) counsel had been retained, (2) the retained counsel was involved in the general of the document, and (3) the document was created out of a "routine practice" or in connection with particular circumstances. *See Hercules Lifeboat Co., L.L.C. v. Rice*, 2012 WL 4483557, at *1 (W.D. La. Sept. 26, 2012). Other courts in this district have found that "[i]f the document would have been created *regardless of whether the litigation was also expected to ensue*, the document is deemed to be created in the ordinary course of business and not in anticipation of litigation." *Piatkowski v. Abdon Callais Offshore, L.L.C.*, No. 99-3759, 2000 WL 1145825, at *1 (E.D. La. Aug, 11, 2000) (emphasis added); *Southern Scrap Material Co. v. Fleming*, 2003 WL 2147516, at *6 (E.D. La. June 18, 2003). "The mere fact that litigation is pending does not transform everything done by or for a party into work product worthy of protection." *Piatkowski*, 2000 WL 1145825, at *2.

In this case, it is clear that the McGovern Report was not produced in the ordinary course of business. First, there is no indication from the pleadings submitted that Global Oil's attorney solicited the commission of the McGovern Report. In fact, at oral argument Global Oil's counsel represented that while he was not sure which Global Oil corporate officer had commissioned the

McGovern Report, he did represent that the report had not been commissioned by Global Oil's counsel.

Further, the documents produced both in support and in opposition of the motion indicate that Global Oil solicited the McGovern Report with the intention of supporting a *criminal* complaint sworn out to the Terrebourne Parish Sheriff's Office regarding Wilfred's alleged theft of Global Oil's property, and *not* the instant litigation. For example, Tomlin concluded investigation of Global Oil's criminal complaint against Wilfred by stating that "this is going to be a civil matter," and communicated the same to Schumaker via email on April 25, 2012. (R. Doc. 148-2, p. 39). It was only after this point, on April 26, 2012, that Schumaker emailed Tomlin and stated that Global Oil "may" pursue civil litigation against the Barnhills. *Id.*

Indeed, based on the documents submitted in connection with the Motion, the Court cannot meaningfully distinguish between those sections of the McGovern Report detailing theft and storage of Global Oil's property, and diversion of Global Oil's business or monetary assets. The criminal complaint sworn out by McCarley on March 14, 2012 is for "possessing/concealing." (R. Doc. 148-2, p. 6). Tomlin states that as to the "modus operandi" of the claim, the McCarley alleged that Barnhill "stole tools" from Global Oil "over a 2 year time span prior to leaving the company." *Id.* at 8. However, Tomlin's investigation into the Barnhills' conduct appears to have been far more wide-ranging. For example, during March and April 2012 Tomlin interviewed several Global Oil employees regarding the alleged conduct. The interviews allude to, *inter alia*, deductions from Global Oil employee 401k programs, which was done in order to "make up" for the money Wilfred was taking. (R. Doc. 148-2, pp. 15-16). The interviews also reveal that Global Oil employees noted that tool-making machinery was being run after hours. *Id.* at 17. Tomlin's questioning on these

topics could have reasonably been motivated in order to establish that Wilfred was taking steps to insulate his alleged theft of Global Oil's equipment from view.  By the same token, sections of the McGovern Report which alluded to diversion of money could allude to the Barnhills' motives to "cover up" their activities.

Notably, the Ghariani Declaration does indicate that Bailey "advised" that a document such as the McGovern Report be produced in order to "prepare for and launch litigation."  However, it does not indicate what steps were taken to actually *protect* the McGovern Report as attorney work-product.  Indeed, although the Ghariani Declaration states that Bailey stated that the findings which became the McGovern Report "needed" to be protected by both the attorney-client and work-product privileges, Global Oil's privilege log does not assert attorney-client privilege protection over the McGovern Report.  The Barnhills' supplemental filing also points out that Bailey is not Global Oil's attorney for the instant dispute, and his involvement is limited to the Barnhills' wage claim.  (R. Doc. 157-1, p. 2).

The McGovern Report also confirms that the work product doctrine does not apply.  The report was produced for *in camera* review.  Notably, although Ghariani declares that McGovern was to "report findings to myself and [Bailey]," the April 9, 2012 transmittal letter in which McGovern presents its Report is addressed only to Ghariani without a carbon copy to Bailey.  The Report also states that "[t]his is a report based on a limited set of procedures undertaken at *your* direction."  (p. I).[11]

The McGovern Report makes no reference to Bailey, nor does it reference either the attorney-client privilege or work-product doctrine.  In fact, it does not mention the possibility of

---

[11]Although this first page of the McGovern Report is unnumbered, the Court refers to it as "I" for the sake of consistency.

civil litigation at all. This last omission is striking - because the Report does specifically state that "[w]e understand that you may share this report with *members of law enforcement* in pursuit of *certain charges* being levied against Barnhill and others." (p. I) (emphasis added). The Report also specifically mentions the police report "as of April 4, 2012" later in the text. (p. 15). In fact, the McGovern Report states, on page 19 that "there are additional procedures which should be performed *related to the other allegations of misconduct which may reveal additional and significant losses and damages to Global*." (p. 19) (emphasis added).

In sum, considering all evidence including the plain language and reasonable inferences from the text of the McGovern Report, the McGovern Report was not composed at Bailey's direction or recommendation; steps were not taken to insulate it with work-product protection; and it was clearly designed to investigate a set of facts which supported Global Oil's criminal complaint against the Barnhills. For these reasons, the Court finds that Global Oil's objection to production, in which it asserted protection under the work product doctrine, is overruled. Accordingly, the Court orders that the McGovern Report be produced to the Barnhills no later than seven days of the issuance of this Order.[12]

## IV.    Conclusion

Accordingly,

**IT IS ORDERED** that Defendants, Wilfred J. Barnhill, Brian A. Barnhill, Diane Barnhill, and Barnhill Industries, Inc.'s, (collectively, the "Barnhills") **Defendants' Motion to Compel Production of Documents Listed in Global Oil Tools' Privilege Log (R. Doc. 140)** is

---

[12]Because the Court has found that the document is not protected by the work product doctrine, the Court need not reach the issue of whether the Barnhills can show a "substantial need" for the document notwithstanding the work product protection.

**GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff, Global Oil Tools, Inc., ("Global Oil") shall produce an identical copy of the April 9, 2012 report of McGovern and Greene, LLP ("McGovern Report") which was submitted to the Court for *in camera* review during the March 13, 2013 oral argument of R. Doc. 140, to the Barnhills no later than seven (7) days of the issuance of this Order.

New Orleans, Louisiana, this 3rd day of April 2013.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**